Your honors, may it please the court, my name is Brett Browns, Cone Council for Appellants, the Wilderness Society and Hells Canyon Preservation Council on this appeal. I'd like to start by stepping back a bit. This is the same appeal, or this is the same case, now six years old, that's before you for the second time on the government's attempt to raise jurisdictional hurdles to appellants' attempt to receive a decision on the merits of its claim that there is illegal motorized use in a federally designated wilderness. The district court decision on appeal today wrongly construed the Appellants Wilderness Act claim as a challenge to the 1981 boundary description of the Hells Canyon wilderness. And as such, it wrongly barred this claim under the statute of limitations at 28 U.S.C. 2401. As to the boundary description claim, isn't that barred by the statute of limitations? The description was noticed and filed in 1981. That's right. It's a six-year statute, right? It's a six-year statute. And what appellants are claiming first is that they pled clearly at paragraph 28 in their complaint an ongoing violation of the Wilderness Act, a failure to prohibit that act under section 706. That's the question about where the road is, whether the road is within the wilderness area, not about where the lawful boundary is. I think Judge O'Scanlan's claim, question to you, went to the location of the boundary, which was established in 1981. Correct. A challenge to that boundary established in 1981 would have been barred as of 1987. That is correct. But the key distinction is appellants here never challenged that 1981 boundary description. Appellants take no issue with that description. What that description says describes the wilderness boundary as the east rim of Summit Ridge. So you're waiving that issue? What appellants have challenged is the ongoing motorized abuse in the Hell's Canyon wilderness. So basically it sounds, if I can paraphrase what I think you're saying, is that there's an ongoing obligation not to have motorized use on a road in a wilderness area. And so if that's happening today, there's not a statute of limitations problem because right now, today, there's an ongoing obligation. But with respect to whether you win on the merits, it seems to me that it's too late for you to challenge the 1981 description. Is that the question? Your Honor, what you stated first is correct. We've alleged continuing violation, and there's an ongoing obligation on the part of the agency under the Wilderness Act to prohibit that violation. You're going to accept the boundary as the Forest Service described it? We're accepting the boundary description, the 1981 boundary description, for what it is. And then there's a dispute over what it means. Then subsequently, subsequent to 1981, the agency had always interpreted that the language in that boundary description, which itself does not define the terms rim, which are the key terms here in this appeal on the merits, key terms of rim and hydrologic divide are never defined in that boundary description. Subsequent to 1981, the agency's interpretation of that description and those terms was always consistent with placing that boundary on the hydrologic divide. Essentially, Your Honor, the crux of the case rests on a false premise here that the government is advancing and the court below adopted, which is that the terms rim and hydrologic divide have to mean something totally inconsistent, which is wrong. And I would like to point first to – But that's really the merits. If we were to agree with you that the placement of the road claim is an ongoing – alleged ongoing violation, then all the questions that you're raising about whether rim means rim or all of those things are on the merits, really, aren't they? That's correct, Your Honor. And we don't reach that, I would assume. I would assume that this decision, the decision on the district court, erred in interpreting the standards for summary judgment or granting summary judgment, that those issues are on the merits. And the first question here is if there's a continuing violation, which we have clearly – appellants have clearly alleged in their complaint, that this statute of limitations, the six-year period, should never be triggered because it's a continuing violation. And as the appellant's briefed on page 11 of its opening brief – or pardon me, its reply brief, where there is a continuing violation, the statute six-year period is not triggered. Is the road that you're complaining about meandering on both sides of the boundary or is it all, from your point of view, all within the wilderness? And if so, how – what's the length of the road we're talking about? Your Honor, appellants contend that it's a 15-mile road, if you can imagine it traveling out north along a high point of land. Appellants contend that it meanders across the hydrologic divide, which subsequent to – and based on the 19-year description and subsequent to it until 2002, the agency had always interpreted as the wilderness boundary. So not all of the motorized trail is on the wilderness side of the hydrologic divide. How much of it is in the wilderness area, according to you? Your Honor, I'd have to go back to the briefing below its summary judgment. In 1997, Appellant Health, Canadian Preservation Council documented, I believe, seven different locations where the trail crosses the hydrologic divide. And it's notable that in the government's brief, as well as Supplemental Exemptive Record 22, there's no dispute over the fact that the road continues to cross the hydrologic divide. The only dispute in the case is whether the hydrologic divide is the wilderness boundary. And that we submit as a question for the merits that the district court wrongly decided on summary judgment because there's a clear dispute over genuine – there's a genuine – pardon me. There's a disputed issue of material fact that goes to the outcome of the Wilderness Act claim as to whether the hydrologic divide is or is not the boundary. What you're asking the Forest Service to do is to – assuming that, to the extent it's within the wilderness, that the Forest Service close the road to motorized traffic or to rip it up? What's the remedy you're seeking? The remedy sought is, in order, the Forest Service must prohibit motorized use. It could do that in one of two ways. It could close the road to motorized use, or it could close the road and then relocate it, which it did in 1992. And in that decision in 1992, based on the same 1981 wilderness boundary language that uses the term East Rim of Summit Ridge, the 1992 road closer decision states that Summit Ridge forms a hydrologic divide of the Hellis Canyon Wilderness and forms the wilderness boundary. So that 1992 decision to relocate the road supports the pellet's contention that even though the 1981 boundary language uses terms like ridge, rim, and hydrologic divide, there's no inconsistency in interpreting those terms as the hydrologic divide. In fact, that's how those terms had consistently been interpreted by the agency, including in the 1992 road closure decision. And as such, that's exactly what the pellets expected the agency to do again when in 1997 they presented the agency with evidence of additional crossings of the divide. The agency instead told them, well, the hydrologic divide is not the wilderness boundary in this portion of the wilderness, even though it was the same portion of the road and the wilderness that... Was the road graded at some point? Your Honor... Or was it created? And I think this is a worthwhile point. We're not talking about a road that was created for the express purpose of allowing and facilitating motorized recreation. This was a road that was created in 1960 as a fire line to suppress fire. So in 1960, the road was bulldozed. That was the only time... So it was initially bulldozed by the Forest Service? It was. To prevent fires. The trail that trucks and jeeps have been using that the Forest Service has simply allowed. It was something that was expressly created by the Forest Service at one point. For the purpose of suppressing fire. And if you can imagine what it looks like, it wasn't graded gravel to that nature. It was a bulldozed trail. And over time, motorized use developed, not authorized by the Forest Service, and I think the District Court gets high-centered in its opinion on page 8, where it focuses on a 706... an Administrative Procedures Act 706-2 arbitrary and capricious analysis where it focuses on the existence of an Affirmative Agency Act in authorizing motorized use. In fact, over time, motorized recreation developed along that trail, and what plaintiffs have alleged is it's not an Affirmative Agency Act they're challenging, it's the Failure to Act. How long has your client known about the use of motorized vehicles on what you allege to be within the wilderness? Since 1997, clients have known about the existence of the road and the existence of the wilderness boundary, but it wasn't until 1997 that they actually documented areas where the motorized use on the road actually intersects the wilderness boundary. Well, didn't the statute of limitations then, as to you, certainly as to you and maybe earlier as to others, expire in 2003? No, Your Honor, and I'm trying to be careful with my time and leave a couple minutes for rebuttal, but certainly not to the Wilderness Society because they were never a plaintiff in that 1994 litigation and not as the Hell's Canyon Preservation Council either because that case arose from a totally different set of facts, and as this Court found in its previous appeal, decision on the previous appeal, it was not until 1997 that Hell's Canyon Preservation Council actually documented areas where the road crosses the hydrologic divide. Was there any reason that couldn't have been established before 1997? I mean, the road's been there since the 60s. The preservation area was created in the late 70s. That's correct. The maps were put out in the 80s. It could have, Your Honor, but the fact is the Hell's Canyon Preservation Council and the Wilderness Society never had reason to suspect that the Forest Service would interpret the wilderness boundary in any way that was inconsistent. But you knew where the hydrological divide was. You didn't need the Forest Service to tell you where the hydrological divide was. You knew where the road was. You didn't need the Forest Service to tell you that. That's correct. In 1989, the agency closed the road for motorized use because it crossed the wilderness boundary. And then they relocated it. And then they relocated it. Relocated 1.5 miles. Correct. Based on the fact that it crossed the hydrological divide. So you've known since 1989 where the current road was, and you can tell for yourselves where the hydrological divide is. Your Honor, no. We can't. Felons could tell for themselves where the hydrological divide is. But it wasn't until 1989 that they began to suspect anything. The 1994 litigation was based on the existence of a Forest Service transportation map. Why didn't the statute of limitations expire in 1995? Can you ask that again, Your Honor? I didn't hear you. Why didn't the statute of limitations then expire in 1995, six years after the road was relocated? Because, Your Honor, appellants had no knowledge, constructive or otherwise, of locations where the road actually crossed the hydrological divide. It thought that it did, and it raised that claim, the same claim that it's raised now in the 1994 litigation. But that claim was premised on a Forest Service transportation map that showed the crossing that the agency then disavowed. Counsel, if in 1989 the Forest Service had held a notice and comment proceeding in which it had said, we're going to relocate this road, we want to make sure we get it right this time, would you still have a claim today? No, Your Honor. So if they'd held a formal proceeding, then you would have had six years to challenge the proceeding or have been barred. Exactly. You wouldn't have any continuing violation. And that's the distinction between an affirmative agency action that fell into a pact of challenging the proceeding. That would have been a 706-2 proceeding, and you claim you've got a 706-1 proceeding. That's correct, Your Honor. And I'd like to reserve the last minute for rebuttal. You may certainly do so, Counsel. Thank you. We'll hear from the Forest Service. May it please the Court. I'm Mark Hague from the Department of Justice for the Forest Service. HCPC's complaint raises two sets of claims, the Wilderness Act claim and also the MAP claim. And the Wilderness Act claim involves these contentions about Lord Flat Road and its intrusion into the wilderness. It's very difficult to understand how HCPC's claims can make sense if they're not challenging the boundary description, but that gets to the merits. That's the merits. That's my issue with this. I mean, if, in fact, your own surveyor were to tell you tomorrow, we've made a mistake, this road crosses into the wilderness, you would do what you did in 1989. Or something similar. You'd close it. You'd fix it. You'd do something because there's a continuing obligation to not have motorized vehicles on roads in the wilderness. So I don't understand why it's time-barred. I understand why you say you went on the merits, but I don't understand why that claim is time-barred. Well, the problem with if they're not challenging the 1981 boundary decision or there was a formal decision to leave the road open, and that was in 1992, in the comprehensive management plan, and it's described in the 1981 environmental impact statement. So the operative facts here, the decision where the boundary is and the decision to leave the road open were made in 1981 and 1982. But the – Yeah, go ahead. You want me to talk about continuing violation. I'm sorry. Yeah. To claim – there's a distinction between a continuing violation and the lingering or ongoing effects of a past unlawful act. There is no continuing decision or continuing agency action here every time somebody drives up on a road. There's a continuing agency obligation under the Wilderness Act not to allow motorized vehicles on roads in a wilderness area. So that's why I asked you the way I did. If your own surveyor came to you and said, oops, we made a mistake, you would have now, today, an ongoing obligation to make sure that that road doesn't cross the boundary. Is that not correct? I don't think that's – the question is not what the agency's duty is here. It's whether the plaintiffs can state a claim. In order to state a claim under the APA, you have to either challenge a final agency action or a failure to take a mandatory action. They're challenging the failure – did you – yeah, thanks. They're challenging the failure to move or close a road that allegedly violates the act. And so it seems to me that you've conflated in your argument the merits with the question of timeliness because it may be that you would win instantly on summary judgment on the merits. Excuse me, Judge. Could I ask the individual please to take the instrument outside right now? Thank you. It seems to me that that's maybe summary judgment on the merits material where you say, look, this is what the boundary description has always been, and their interpretation is wrong because, and they'll say, we know that's what the description says, but here's our interpretation. Nobody's challenging that the document exists or what it says. I think the difference between you is what it means on the ground as to where the boundary actually falls. But I guess I just have difficulty seeing why this isn't a merits question. The problem is in order to state a claim for continuing violation, there has to be a mandatory duty for the agency to take a discrete action, and a continuing violation is distinct from the lingering effects of a past decision. The decision to open this road was made in 1981 and 1982, or to leave it open. Well, no. The decision not to move it or close it is a decision that is made every day, and if you have a mandatory duty to do that, then I don't understand. Counsel, is this a situation of the glass is half empty or it's half full? It depends entirely on the approach that one makes to identifying the issue. One could say, as you argue, that the decision was made in 1981. You acknowledge you have a continuing duty, but that is not necessarily triggered by the claim here. I want to be careful about what acknowledging a continuing duty. The Wilderness Act sets out or provides no motorized use in wilderness areas, but that's not the ---- And there's no language in the Act that puts it in continuing terms, is there? Well, what is the language? It's not the ---- I mean, the cases that talk about the typical Section 701, 706-1 APA case, mandatory duty cases, are where the statute says the secretary shall promulgate regulations within 12 months of an act. And if the secretary doesn't do that, somebody can come into court and get an order, compelling the secretary to take action. But the general obligation of no motorized use in wilderness areas is much more like the kinds of obligations that the Supreme Court describes in SUA that are not enforceable under Section 706-1. Was there a time when this action was challengeable? Yes, absolutely. I'm sorry. It was 1981. Was the second date that you gave us 1992? 1982. 1982. The boundary description was promulgated after public notice in 81. And at that point, I believe, Your Honor, you asked this question earlier. At that point, HCPC knew everything it needed to know. It knew where the boundary was. It knew where the hydrologic divide was. And the road was there. What were the form of the 81 and 82 proceedings? Were they formal proceedings? Yes. Comfort comment? Yes. So nothing ---- After the road was closed and reopened, what kinds of proceedings led to that and what kinds of proceedings surrounded that? I guess those were informal proceedings, but there was public notice. First, when the Forest Service became aware of the boundary problem or the problem that the road crossed the boundary, it closed the road. That was in 1989. And in 1992, it issued a record of decision saying,  And HCPC challenged that decision and litigated whether that was permissible under NEPA. That was the 1994 action. That's right. The record of decision, the rod was issued in 1992? Yes. Is that in the record? It is. It's S.E.R. 12 and 13, I think. 12 and 13? Yes. So the problem here, and this is what the district court wrestled with, is there's no way to ---- if you frame their claim, I guess, and Turtle Island says the court is supposed to look at what's the focus of the claim and that artful pleading is not ---- the statute of limitations is not to be defeated by artful pleading. If you look at the claim as a challenge to the boundary description, then it's time barred. If you try to frame it as a challenge to new agency interpretations or a continuing violation, you can't state a claim under DAPA because they need to find an ongoing action as opposed to the lingering effects of a past action or they need to find a failure to act when, in fact, the agency, what they're complaining about is an action that the agency took. They took it in 1981. I would speak ---- I'm sorry. I was going to say if you have anything further. I'd speak briefly to the MAP claim. All right. We address it in our brief that that claim is not justiciable because they haven't shown any cognizable legal ---- legally cognizable injury as a result of the loss of the MAP and they also haven't shown how that claim can be redressed. HCPC didn't respond to any of those points in its reply brief. If we were to be persuaded that the road was within the wilderness, what would the Forest Service be required to do at this stage? Going back to what happened in 1992 or some ---- is there any different remedy that would be applicable to that? Well, in the posture of this case, I don't think the Court could make that decision. The question, this case was decided on summary judgment, but ---- That's a merits issue. That's a merits issue. Right. Whose interpretation of the 1981 boundary description is correct is a merits issue. That's right. And just the notion that this boundary description is subject to interpretation is at odds with the nature of the boundary description itself. If you look at the supplemental excerpts on page 31 and 32, it's a meets and bounds description. Well, it's more than that. It references the ---- It references the hydrologic divide. It references the east rim of Summit Ridge. It references other ridges and rims and all kinds of things that don't necessarily ---- are not totally meets and bounds. For example, there's one place where it says approximately so many feet to an intersection with what would probably be something once we survey it. I mean, it isn't like a lot in northeast Portland. No, that's definitely true. But most of the points in the relevant section, which is pages 31 and 32 of the supplemental excerpts, are identified by specific points on the state plane coordinate system. There are a few references to the east rim. But when that is all read in context, certainly a surveyor can tell with a great deal of certainty where that ---- Well, that's the merits question. And that's why I say, you know, you may win in five minutes on the merits. Counsel, I have one further question. I'm going to ask Mr. Brownstone the same question. Is the statutory provision in issue here, 1133C, the prohibition against commercial enterprise, roads, so forth, except as specifically provided and subject to what's so-and-so, there shall be no commercial enterprise and no permanent road within any wilderness areas, is that the overarching command that's at issue here? I believe there's an additional section of the Wilderness Act that proscribes motorized use. There shall be no temporary road, no use of motor vehicles, motorized equipment, or motor boats.  Yes. All right. So with respect to this issue of continuing violation or continuing duty, there's no other provision that uses those terms? I think that's right. I mean, that prohibition would also be incorporated into the comprehensive management plan. Right. But that's right. And the problem is that that, the Wilderness Act provision is not, doesn't provide a private right of action. It's only, it's enforceable through the APA, and that gets you into Section 706-1 and of course 706-2. Right. Okay. Thank you, counsel. Mr. Brownstone, you have a little time? Can you confirm that's the provision you're relying on? Thank you, Your Honor. The provision in the Wilderness Act is, I believe, at Section 1133, I believe it's A, which is a clear prohibition against motorized use within federally designated wilderness. As to the continuing violation issue, it's true, there must be a mandatory duty. Well, I look at A, and it says purposes and so forth. I think you mean C, where it says motorized use prohibited. I was scrambling through the brief and didn't find it. Yes. Okay. It's 1133C. All right. And there's nothing in there that uses the word continuing duty or continuing violation? No, but as to that, Your Honor, the government's right. There has to be a mandatory duty, and it has to be discreet as per the standards, the Supreme Court standards in Norton v. SUA. The mandatory duty here is if there is motorized use in the wilderness, the Act clearly requires the agency to prohibit that. Counsel, I asked you if the Forest Service had conducted a proceeding and issued a rule on this, whether you would have had six years of talent, and you answered, I think, very honestly, yes. So why isn't the decision memo found at pages 12 through, well, 15, 16 of the S.E.R., sufficient to trigger your obligation to bring a suit within six years? That decision memo, Your Honor, related to the relocation of the road. That relocation was— But it also, at that time, fails to change anything else in the road. I mean, it does sort of establish, here's the road. We are going to make these changes. We are not going to make other changes. But it was a very formal act by the Forest Service. Why didn't you have six years to challenge it from that point? That was the first time, Your Honor, which counsel put on notice, that there are portions of this road that cross the hydrologic divide. Why didn't you have six years? Why didn't you bring a challenge within—by 1998? We had to have either actual or constructive notice that there was a legal injury there. The only—the basis of the wilderness act claim that we did challenge in that case was a 1994 Forest Service transportation map that seemed to depict other violations. What information were you missing in 1992? Actual knowledge, clear knowledge of where the road itself intersects the hydrologic divide. That was available to you at any time. You had the maps. You had—you can go out there and walk the area. You could figure this out for yourself. What were you missing? The fact that you didn't hike it until 2005? Your Honor, that's—we were missing— You filed the lawsuit in what year? 1994. No, I'm sorry. I'm sorry. This lawsuit— You just filed a lawsuit. The current lawsuit was filed in 2002. What did you discover in 2002 that you couldn't have learned in 1992? Appellants, after the 1992 road closure and the 1994 litigation where there was a map that the agency disavowed showing other areas where the road seemed to cross the hydrologic divide, that's when appellants did go out and ground truth and find areas where— What couldn't you have learned in 1992 that you learned in 2002? I think what we did not know in 2002— That wasn't my question. It was not what you didn't know. It was what you couldn't have known. Your Honor, that the agency would do an about-face and begin to reinterpret its understanding of the Woodlands Boundary as the hydrologic divide when we documented the areas where the road did cross the divide. We wanted to work with— The appellants approached the Forest Service, and this is documented in the briefing, and tried to solve the issue administratively, and that happened in 1997. It became clear in response to Freedom of Information Act requests and other statements in 2002 that the agency was no longer understanding the terms in the Woodlands Boundary to mean the same things that they meant in the past, which are the things—the understanding that the boundary is on the hydrologic divide, and that was the basis for its decision in 1992 to close the road. Thank you, counsel. Our questions have taken you over time. Thank you, Your Honor. The case just argued will be submitted for decision, and the Court will adjourn.
judges: O'scannlain, Graber, Bybee